**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**February 28, 2012**

**TENTH CIRCUIT**

MUSCOGEE (CREEK) NATION, a
federally-recognized Tribe,

        Plaintiff - Appellant,

v.

SCOTT PRUITT, Attorney General of
Oklahoma; THE OKLAHOMA TAX
COMMISSION; THOMAS KEMP, JR.,
Chairman, Oklahoma Tax Commission;
JERRY JOHNSON, Vice-Chairman,
Oklahoma Tax Commission; DAWN
CASH, Secretary, Oklahoma Tax
Commission,

        Defendants - Appellees.

No. 11-7005

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. NO. 6:10-CV-00019-JHP)**

---

Joseph V. Messineo, Fredericks Peebles & Morgan, LLP, Omaha, Nebraska, and Michael
A. Simpson, Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., Tulsa,
Oklahoma (Conly J. Schulte, Fredericks Peebles & Morgan, LLP, Omaha, Nebraska, and
Galen L. Brittingham, Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,
Tulsa, Oklahoma, with them on the briefs), appearing for Appellant.

E. Clyde Kirk, Assistant Attorney General, Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee E. Scott Pruitt, Oklahoma Attorney General, and Larry D. Patton, Assistant General Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, appearing for Appellees Oklahoma Tax Commission and its Commissioners.

---

Before **GORSUCH, HOLMES,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

In Oklahoma, cigarette and other tobacco product sales to tribal members in Indian country are exempt from state taxes. To prevent non-tribal members from avoiding taxes on their purchases of such products in Indian country, Oklahoma adopted a tax-stamp scheme to ensure that taxes are collected for those sales. Oklahoma also requires tobacco product manufacturers either to enter into and make payments under a Master Settlement Agreement with the State or to pay a certain percentage of each sale into an escrow fund. Any brand of cigarette produced by a manufacturer that does not comply with these requirements is deemed contraband. The Muscogee (Creek) Nation ("MCN") objects to these requirements as violative of federal law and tribal sovereignty. Supreme Court precedent holds otherwise.

MCN sued the Oklahoma Tax Commission ("OTC"), its three commissioners, and the Oklahoma Attorney General (collectively, the "State"). MCN sought declaratory and injunctive relief based on numerous claims challenging three Oklahoma statutes that tax and regulate the sale of cigarettes and other tobacco products. The OTC, along with its

-2-

three commissioners, and the Attorney General brought two separate motions to dismiss. The district court dismissed MCN's claims against all defendants based on the State's Eleventh Amendment immunity or, alternatively, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that the Eleventh Amendment does not preclude this suit, but we affirm the dismissal for failure to state a claim.

## I. BACKGROUND

### A. *The Oklahoma Statutes at Issue*

Before delving into the procedural history of this case, we first review the three Oklahoma statutes underlying MCN's complaint.

#### 1. *Okla. Stat. tit. 68, § 349.1—the Excise Tax Statute*

Under Oklahoma's Excise Tax Statute, the OTC imposes an excise tax on the sale of cigarettes and other tobacco products. The OTC collects the tax from OTC-licensed wholesalers. *See* Okla. Stat. tit. 68, §§ 302 to 302-5; 402 to 402-3. The wholesaler must purchase stamps from the OTC to show that it has paid the excise tax. *Id.* §§ 302; 403. Although the wholesaler initially pays the tax when it purchases the stamp, the tax is ultimately passed down to the consumer. *See Id.* §§ 302 to 302-5.

Indian tribes can choose to enter into compacts with the State to govern the collection of state taxes on cigarettes and tobacco products sold in Indian country. *See id.* § 346(C). Tribes that enter into such compacts are deemed "compacting," whereas tribes, such as MCN, who do not, are deemed "noncompacting."

The Excise Tax Statute, Okla. Stat. tit. 68, § 349.1, governs the tax on cigarettes and other tobacco products sold by noncompacting tribes. Section 349.1 exempts from the tax the sale of such products by Indian tribes and tribally-licensed retailers to the tribe's own members when those sales occur in the tribe's Indian country.[1]

When a tribally-licensed retailer sells cigarettes to a member of a noncompacting tribe on that tribe's Indian country, the cigarettes must bear a stamp issued by the OTC (a "tax-free stamp") evidencing that they have been purchased free from the excise tax. *Id.* § 349.1(C). The OTC distributes these tax-free stamps to OTC-licensed wholesalers that supply cigarettes to tribally-licensed retailers. *Id.* § 349.1(C)(5).

The number of tax-free stamps that the OTC distributes to a wholesaler depends on the "probable demand." *Id.* § 349.1(C)(4). The OTC determines the probable demand for each tribe by multiplying the population of the tribe located in Oklahoma by the

---

[1]Under 18 U.S.C. § 1151, Indian country is defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Okla. Stat. tit. 68, § 348(3), which also defines the term "Indian country," includes the three definitions from 18 U.S.C. § 1151, but expands the definition by adding "land held in trust by the United States of America for the benefit of a federally recognized Indian tribe or nation."

percentage of smokers in Oklahoma or the percentage of smokers in the United States, whichever is greater. *Id.* § 349.1(C)(1). The OTC then multiplies this number by the average yearly consumption of cigarettes by smokers in Oklahoma or smokers in the United States, whichever is greater. *Id.*

After the OTC calculates its preliminary determination of the probable demand, it must furnish that calculation to the governing bodies of the tribes, which may then submit information regarding the sufficiency of the probable demand, including "a verifiable record of previous sales to tribal members or other statistical evidence." *Id.* § 349.1(C)(2). After considering this information, the OTC must make a final determination of the probable demand and furnish it to the tribe. *Id.* § 349.1(C)(3). The OTC then distributes the tax-free stamps to its licensed wholesalers based on its probable demand calculation. Once a wholesaler has received its allocated share of tax-free stamps, the wholesaler may not receive more "absent good cause shown by verifiable information submitted by the wholesaler and/or that tribe or nation, which shall be considered and determined by the [OTC] on a case-by-case basis." *Id.* § 349.1(C)(5).

Different provisions apply to the sale of tobacco products other than cigarettes. *See id.* § 349.1(D). Unlike with cigarettes, OTC-licensed wholesalers are required to affix a tax stamp to all other tobacco products, even those to be sold by tribally-licensed retailers to tribal members on that tribe's Indian country. *Id.* The OTC-licensed wholesalers must bear the initial incidence of the excise tax on these sales. At the end of each month, OTC-licensed wholesalers may request a refund or credit for the previous

month's tax-free sales equal to the lesser of 1/12 of their allocated share of the probable demand or their verifiable tax-free sales to tribally-licensed or tribally-owned retailers. *Id.* at § 349.1(D)(5). The probable demand is calculated in the same manner as the calculation for cigarettes, substituting use and users of other tobacco products for use and users of cigarettes. *Id.* § 349.1(D)(1). Once an OTC-licensed wholesaler has received a refund or credit for a particular month, it may not receive any further refund or credit for that month "absent good cause shown by verifiable information submitted by the wholesaler and/or the noncompacting tribe or nation, which shall be considered and determined by the [OTC] on a case-by-case basis." *Id.* § 349.1(D)(5).

### 2. *Okla. Stat. tit. 37, §§ 600.21-600.23 and tit. 68, §§ 360.1-360.9 —the Escrow Statute and the Complementary Act*

In 1998, Oklahoma entered into a Master Settlement Agreement ("MSA") with leading United States tobacco product manufacturers. *See* Okla. Stat. tit. 37, § 600.21(C). The MSA requires the participating manufacturers to make settlement payments to the State to cover, among other things, health costs generated by tobacco use among Oklahoma residents. *Id.* § 600.21(B), (C). To prevent the non-participating manufacturers from receiving a competitive advantage over the participating manufacturers, the State enacted the Escrow Statute. *See id.* § 600.21(D). The Escrow Statute requires all tobacco product manufacturers selling cigarettes to consumers in Oklahoma to be an MSA member or pay specified amounts into a qualified escrow fund. *Id.* § 600.23(A).

The amount that non-participating manufacturers must pay into the escrow fund is based on "units sold." *Id.* § 600.23(A)(2). "Units sold" are "the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer . . . during the year in question . . . measured by excise taxes collected by the state on [cigarettes] bearing the excise tax stamp . . . ." *Id.* § 600.22(10). Thus, the Escrow Statute applies only to cigarettes bearing the Oklahoma excise tax stamp and not to cigarettes bearing tax-free stamps.

To aid the Attorney General in enforcing the Escrow Statute, Oklahoma in 2004 enacted the Master Settlement Agreement Complementary Act (the "Complementary Act"). Okla. Stat. tit. 68, §§ 360.1, 360.2. The Complementary Act requires every tobacco product manufacturer selling cigarettes in Oklahoma to certify to the Attorney General and the OTC that it is either participating in the MSA or that it has made payments to the escrow fund as required by the Escrow Statute. *Id.* § 360.4(A).

The Attorney General maintains a directory of all complying tobacco product manufacturers, participating and non-participating, and the brand families that they produce. *Id.* § 360.4(B). The Complementary Act makes it unlawful to affix a tax-stamp to a package or container of cigarettes if its manufacturer or brand family is not listed on the Attorney General's directory. *Id.* § 360.4(C)(1). It is also unlawful to "[s]ell, offer, or possess for sale, in [Oklahoma], or import for personal consumption in [Oklahoma]" cigarettes from a manufacturer or brand family not listed on the Attorney General's directory. *Id.* § 360.4(C)(2). "[C]igarettes that have been sold, offered for sale, or

possessed for sale in [Oklahoma] or imported for personal consumption in [Oklahoma], in violation of the [Complementary Act]" are contraband and subject to seizure and forfeiture.  *Id.* § 360.7(B).

## B.  Factual and Procedural Background

MCN is a federally-recognized Indian tribe located in Oklahoma.  It operates a tobacco wholesale business that markets and sells tobacco products to tribally-licensed retailers within MCN's Indian country.  MCN's wholesaler is not licensed by the OTC. Nevertheless, it continues to distribute cigarettes and other tobacco products to its tribally-licensed retailers without a tax or tax-free stamp.

MCN sued the OTC, its three commissioners, and the Oklahoma Attorney General on January 11, 2010, in the Eastern District of Oklahoma.[2]  It requested declaratory and injunctive relief, claiming that the Excise Tax Statute, Escrow Statute, and Complementary Act improperly regulate MCN's sale of tobacco products to its own members and place impermissible burdens on the sale of tobacco products to non-tribal members.  It made six claims, alleging that the three Oklahoma statutes:  (1) violate MCN's due process rights; (2) violate MCN's equal protection rights; (3) are preempted by the Indian Trader Statutes, 25 U.S.C. §§ 261-264; (4) violate the Indian Commerce and Supremacy Clauses of the United States Constitution; (5) violate MCN's tribal self-government; and (6) violate, as a parens patriae claim, MCN's right of equal protection

---

[2]MCN originally named and later dropped its claims against the Governor of Oklahoma.

and right to be free from discrimination.

The OTC, along with its commissioners, and the Attorney General filed two separate motions to dismiss. Both motions argued (1) lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) based on Eleventh Amendment immunity, and (2) failure to state a claim under Fed. R. Civ. P. 12(b)(6). The district court granted these motions, holding that it did not have subject matter jurisdiction and, in the alternative, that MCN failed to state a claim.

## II.     MCN'S CLAIMS ON APPEAL

Although MCN's complaint lists six claims, two core issues permeate the complaint: the challenged laws (1) are preempted by the Indian Trader Statutes, and (2) violate MCN's right to tribal self-government.

Instead of presenting a claim-by-claim analysis in its brief, MCN presents arguments addressing only these two issues and does not tie these arguments to its individual claims. MCN even explains that it essentially has only "one claim for procedural relief—a declaratory judgment (and injunctive relief to enforce that declaration) . . . [and] that [MCN] has preserved its overall claim that [the Excise Tax Statute] and the Complementary Act are invalid and unenforceable." Aplt. Reply Br. at 12-13. MCN's counsel repeated this contention at oral argument.

Because MCN raises only these two issues on appeal—preemption and tribal self-government—we will consider only those issues. *See United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled that arguments inadequately briefed in the

-9-

opening brief are waived." (quotations omitted)); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). Although MCN argues in its reply brief that it did not abandon any of its complaint's six claims, this assertion without accompanying argument is not sufficient to preserve issues for review.[3] *See Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) ("Since Plaintiff's disaffirmation is not, in any event, followed by any argument on the merits of the claims involved, we deem them waived under the general rule that even issues designated for review are lost if they are not actually argued in the party's brief.").

Thus, we consider the validity of the Excise Tax Statute, the Escrow Statute, and the Complementary Act based on preemption and infringement of tribal self-governance and do not address whether these statutes violate due process, equal protection, the Supremacy and Indian Commerce Clauses, or MCN's right to be free from discrimination.

## III. JURISDICTION

### A. Eleventh Amendment Sovereign Immunity

States enjoy sovereign immunity from suit under the Eleventh Amendment. *See Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1637 (2011); *P.R. Aqueduct*

---

[3]MCN's complaint names the OTC commissioners "in their official and individual capacity." ROA, Vol. 1 at 18. MCN's briefs do not mention its individual capacity claims against the OTC commissioners. Thus, we do not consider these claims.

*& Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("This withdrawal of jurisdiction effectively confers an immunity from suit. Thus, this Court has consistently held that an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." (quotations omitted)).

But Eleventh Amendment immunity is not absolute. *See Port Authority Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). There are three exceptions. First, a state may consent to suit in federal court. *Id.* Second, Congress may abrogate a state's sovereign immunity by appropriate legislation when it acts under Section 5 of the Fourteenth Amendment. *See Va. Office for Prot. & Advocacy*, 131 S.Ct. at 1638 & n.2. Finally, under *Ex parte Young*, 209 U.S. 123 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

## B. The District Court's Subject Matter Jurisdiction Analysis

The district court determined that none of the exceptions to Eleventh Amendment immunity applied and that it did not have subject matter jurisdiction over any of MCN's claims. It dismissed the complaint. The district court found that it lacked jurisdiction over MCN's claims against the OTC because the State had not lost its Eleventh Amendment immunity either by waiver or congressional abrogation under 28 U.S.C. § 1362. Regarding MCN's claims against the OTC commissioners and the Attorney General, the district court found that the *Ex parte Young* exception did not apply. It

-11-

acknowledged that MCN properly requested prospective relief against state officials

acting in their official capacities, but held that the exception did not apply because MCN

did not set forth a "plausible claim of a violation of federal law." ROA, Vol. 2 at 387.

Thus, in determining whether the *Ex parte Young* exception applies, the district court

relied on the same standard that applies to a motion to dismiss for failure to state a claim

under Fed. R. Civ. P. 12(b)(6)—the plausibility analysis required by *Ashcroft v. Iqbal*,

556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). The

district court erred in equating these standards.

### C. The Ex parte Young *Standard for Sufficiency of the Complaint*

To determine whether the *Ex parte Young* exception applies, we "need only

conduct a straightforward inquiry into whether the complaint alleges an ongoing violation

of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535

U.S. at 645 (quotations and brackets omitted). Thus, for the *Ex parte Young* exception to

apply, plaintiffs must show that they are: (1) suing state officials rather than the state

itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief.[4]

---

[4]We also previously recognized a fourth requirement: "whether the suit rises to the level of implicating 'special sovereignty interests.'" *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 866 (10th Cir. 2003) (quoting *Robinson v. Kansas*, 295 F.3d 1183, 1191 (10th Cir. 2002)). But in *Verizon*, the Supreme Court stated that this inquiry was no longer required under an *Ex parte Young* analysis. *Verizon*, 535 U.S. at 645 ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (quotations omitted)); *see also Hill v. Kemp*, 478 F.3d 1236, 1259 (10th

Continued . . .

-12-

*See Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 866 (10th Cir, 2003); *Lewis v. N.M. Dep't of Health*, 261 F.3d 970, 975 (10th Cir. 2001).

The second prong—whether the plaintiff has alleged an ongoing violation of federal law—"does not require us to ascertain whether state officials actually violated federal law." *Chaffin*, 348 F.3d at 866. Instead, "we only need to determine whether Plaintiffs state a non-frivolous, substantial claim for relief against the [s]tate officers that does not merely allege a violation of federal law 'solely for the purpose of obtaining jurisdiction.'" *Id*. (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 n.10 (1949)).

Different standards apply to a motion to dismiss based on lack of subject matter jurisdiction under Rule 12(b)(1) and a motion to dismiss for failure to state a claim under Rule 12(b)(6). As the Supreme Court explained in *Bell v. Hood*, 327 U.S. 678 (1946):

> Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. *For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.* Whether the complaint states a cause of action on which relief could be granted is a question of law[,] and just as issues of fact[,] *it must be decided after*[,] *and not before*[,] *the court has assumed jurisdiction over the controversy.* If the court does later exercise its jurisdiction to determine

_____

Cont.

Cir. 2007) ("[T]o the extent that [we read] . . . [*Idaho v.*] *Coeur d'Alene* [*Tribe of Idaho*, 521 U.S. 261 (1997),] as requiring federal courts to examine whether the relief sought against a state official implicates special sovereignty interests, we recognize today that *Verizon Maryland* abrogated this step." (citations omitted) (quotations omitted)).

that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

*Id.* at 682 (emphasis added). We applied this principle to the issue of Eleventh Amendment immunity in *Harris v. Owens*, 264 F.3d 1282 (10th Cir. 2001), where we stated that "the question whether [a] suit states a claim upon which relief can be granted is [not] coincident in scope with [an] Eleventh Amendment inquiry." *Id.* at 1289.

Because "[j]urisdiction is not defeated by the possibility that averments might fail to state a cause of action on which petitioners [can] actually recover," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citations omitted) (quotations omitted), our analysis of subject matter jurisdiction does not turn on whether the complaint states a valid cause of action. In fact, in *Harris*, we reviewed an order dismissing a complaint on the alternative grounds of lack of subject matter jurisdiction based on Eleventh Amendment immunity and failure to state a claim. 264 F.3d at 1285-86. We decided that the district court had subject matter jurisdiction over the claims under the *Ex parte Young* exception but that it properly dismissed the complaint for failure to state a claim. We explained: "While we ultimately reject [the plaintiff's] claim on the merits [for failure to state a claim], it should not be characterized as frivolous." *Id.* at 1289.

The district court in this case erred in applying the plausibility standard applicable to Rule 12(b)(6) to conclude that the *Ex parte Young* exception did not apply.

-14-

### D. MCN's Complaint Meets the **Ex parte Young** *Requirements for its Claims Against the OTC Commissioners and the Attorney General*

MCN's complaint satisfies the *Ex parte Young* exception's three requirements for its claims against the OTC commissioners and the Attorney General. First, MCN sued state officials rather than the state itself when it sued the OTC commissioners and the Attorney General in their official capacities. Second, MCN alleged an ongoing violation of federal law. It claimed that federal law preempts the Oklahoma statutes and that the statutes infringe on its tribal sovereignty. Both of these claims are allegations of ongoing violations of federal law. Finally, MCN sought prospective relief by requesting the court to order the OTC commissioners and the Attorney General to stop enforcing the cigarette and other tobacco product laws against it.

For these reasons, we hold that the district court had subject matter jurisdiction over MCN's claims against the OTC commissioners and the Attorney General under the *Ex parte Young* exception to Eleventh Amendment immunity.

### E. Subject Matter Jurisdiction and the OTC

MCN argues that we have jurisdiction over its claims against the OTC based on state waiver under Okla. Stat. tit. 68, § 226 and congressional abrogation through 28 U.S.C. § 1362.

Because, as discussed below, we affirm dismissal of MCN's complaint for failure to state a claim, we need not decide whether we have jurisdiction over MCN's claims against the OTC. Although we usually must resolve jurisdictional questions before

-15-

addressing the merits of a claim, "[we] may rule that a party loses on the merits without first establishing jurisdiction [when] the merits have already been decided in the court's resolution of a claim over which it did have jurisdiction." *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259-60 (10th Cir. 2009). In these circumstances, "resolution of the merits is 'foreordained,'" and "resolution of the jurisdictional question [can] have no effect on the outcome." *Id.* at 1260 (quoting *Steel Co.*, 523 U.S. at 98).

MCN's claims against the OTC are identical to its claims against the OTC commissioners and the Attorney General. Because we have jurisdiction over MCN's claims against the OTC commissioners and the Attorney General under the *Ex parte Young* exception, and because we ultimately affirm dismissal of MCN's claims against them, the fate of MCN's claims against the OTC is "foreordained." *See Id.* at 1263. We therefore need not determine whether there is subject matter jurisdiction over MCN's claims against the OTC.

## IV.    FAILURE TO STATE A CLAIM

We next review MCN's claims in view of the district court's alternative theory for dismissal:  failure to state a claim under Fed. R. Civ. P. 12(b)(6). We review such a dismissal de novo. *Kan. Penn. Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). "[T]o withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "[M]ere 'labels and conclusions,' and a 'formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual

-16-

allegations to support each claim." *Id.* (quoting *Twombly*, 550 U.S. at 555). "'[O]nly a complaint that states a plausible claim for relief [will] survive[] a motion to dismiss.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950).

### A. *Legal Background*

#### 1. *Historical and Modern Views of Indian Sovereignty*

"[T]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 168 (1973) (quotations omitted). Historically, states could not impose their laws on Indians living in Indian country. *Worcester v. Georgia*, 31 U.S. 515, 520 (1832) ("[T]he laws of [the state could] have no force . . . but with the assent of the [Indians] themselves, or in conformity with treaties, and with the acts of congress."). This limitation on states' power to apply their laws in Indian country stems from the Indian Commerce Clause, Art. 1, § 8, cl. 3 (Congress has the power "[t]o regulate Commerce . . . with the Indian Tribes"), which vests exclusive legislative authority over Indian affairs in the federal government. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980); *see also California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) ("The court has consistently recognized that . . . tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." (citations omitted) (quotations omitted)); Felix S. Cohen, Cohen's Handbook of Federal Indian Law 520 (2005) ("The limitation on state power in Indian country stems from the Indian Commerce Clause . . . .").

-17-

The modern Supreme Court, however, has modified this principle. *See, e.g.*, *Bracker*, 448 U.S. at 141 ("Long ago the Court departed from Mr. Chief Justice Marshall's view that 'the law of [a state] can have no force' within reservation boundaries." (quoting *Worcester*, 31 U.S. at 520)). The "trend has been away from the idea of inherent sovereignty as a bar to state jurisdiction." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 165 n.1 (1980) (Brennan, J. concurring in part and dissenting in part). The Court now recognizes that "[w]hile they are sovereign for some purposes, it is now clear that Indian reservations do not partake of the full territorial sovereignty of States or foreign countries." *Id* at 165. The Court still acknowledges, however, "that . . . Indian tribes retain attributes of sovereignty over both their members and their territory," *Bracker*, 448 U.S. at 142 (quotations omitted), and still have the right "to make their own laws and be ruled by them," *see Williams v. Lee*, 358 U.S. 217, 220 (1959); *see also Nevada v. Hicks*, 533 U.S. 353, 361 (2001).

## 2. *Determining When State Law Is Applicable to Indian Activities*

"[T]here is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." *Bracker*, 448 U.S. at 142. Instead, there are "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Id.* "First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them." *Id.* (citations omitted) (quotations omitted); *Muscogee (Creek) Nation v. Okla. Tax. Comm'n*,

-18-

611 F.3d 1222, 1236 (10th Cir. 2010) ("*Muscogee I*"). Either barrier, standing alone, can be a sufficient basis for finding a state law inapplicable. *Bracker*, 448 U.S. at 143; *see also Muscogee I*, 611 F.3d at 1237 ("Because MCN points to no federal law other than the Indian Commerce Clause that might override or preempt the authority of the Commissioners . . . MCN must rely on the second 'barrier' . . . .").

Before analyzing MCN's claims, we first explain the preemption and infringement barriers, their application to the area of state taxation, and the impact of the Indian Trader Statutes on this analysis. We also include a summary of the cases in which the Supreme Court has examined the validity of state cigarette taxes.

### a. Preemption

The Supreme Court instructed in *Bracker* that courts should not apply a traditional preemption analysis to determine whether federal law preempts state law as applied to "tribal reservations and [tribal] members." *See Bracker*, 448 U.S. at 142-43. "The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regarding Indian tribes those standards of pre-emption that have emerged in other areas of the law." *Id.* at 143. "Tribal reservations are not States, and the difference in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other." *Id.*

To determine whether preemption bars the application of a state law to an Indian reservation or its tribal members, the *Bracker* Court instructs us to conduct a "particularized inquiry into the nature of the state, federal, and tribal interests at stake"

-19-

and balance those interests under the "backdrop" of Indian sovereignty. *Id.* at 143-45. To properly consider the "backdrop" of Indian sovereignty, we must examine "[r]elevant federal statutes and treaties . . . in light of 'the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.'" *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 838 (1982) (quoting *Bracker*, 448 U.S. at 144-45). "Under this balancing test, '[s]tate jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the [s]tate interests at stake are sufficient to justify the assertion of [s]tate authority.'" *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1186 (10th Cir. 2011) (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983)).

### b. Tribal Self-Governance

Although tribal sovereignty serves as a backdrop for the preemption analysis, it also still stands as an independent barrier to the application of state law. *See Bracker*, 448 U.S. at 143 ("The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.").[5] But invalidation of a state law because it interferes

---

[5]Some have questioned the continued applicability of the infringement barrier. *Compare McClanahan*, 411 U.S. at 172 ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption."), *and* Erik M. Jensen, *Taxation & Doing Business in Indian Country*, 60 Me. L.Rev. 1, 61 (2008) ("[T]he cases involving state taxation within Indian country

Continued . . .

-20-

with tribal sovereignty is not favored. *Rice v. Rehner*, 463 U.S. 713, 720 (1983) ("Repeal [of a state law] by implication of an established tradition of immunity or self-governance is disfavored."); *see also McClanahan*, 411 U.S. at 172 ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption."). In *Montana v. United States*, 450 U.S. 544 (1981), the Supreme Court explained the attributes of tribal sovereignty that have not been divested or diminished. It explained that tribal power extends to "what is necessary to protect tribal self-government or to control internal relations." *Id.* at 564. Thus, the question is whether application of a state law to Indian reservations or its tribal members violates the Indians' right "to make their own laws and be ruled by them." *See Williams*, 358 U.S. at 220.

_____

Cont.

have overwhelmingly applied preemption doctrine, with at most a passing reference to infringement."), *with Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 457-60, 464 & n.14 (1995) (applying a preemption analysis and recognizing that the tribe did not assert that the state's tax law infringed on tribal self-government and that claim was not properly before the Court), *Muscogee I*, 611 F.3d at 1237 (finding that a state law did not fail the preemption analysis and requiring MCN to rely on the infringement barrier, but finding that the state law did not fail that barrier either), *and* Scott A. Taylor, *The Importance of Being Interest: Why A State Cannot Impose its Income Tax on Tribal Bonds*, 25 Akron Tax J. 123, 161 (2010) ("State infringement of tribal sovereignty, at least as a theoretical matter, does remain a separate and independent bar to the exercise of state authority within Indian country."). Based on the Supreme Court's repeated mention of the infringement prong, we conclude that it is still a necessary part of our analysis.

### c. Application of the Preemption and Infringement Barriers and the "Vexing"[6] Area of State Taxation

Application of the preemption and infringement barriers depends on the factors of "who"—Indians or non-Indians— and "where"—in or outside the tribe's Indian country. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005). The Court has applied general standards based on "who" and "where" to cases involving state taxation.

When on-Indian country conduct ("where") involving only Indians ("who") is at issue, state law is generally inapplicable. *See Bracker*, 448 U.S. at 144. The state's regulatory interest is usually minimal and the federal interest in encouraging tribal self-government is strong. *Id.* It is unnecessary under these circumstances to analyze the preemption and infringement barriers and to balance state, tribal, and federal interests because "the federal tradition of Indian immunity from state [regulation] is very strong and . . . state interest in [regulation] is correspondingly weak." *Cabazon Band*, 480 U.S. at 215 n.17. For state taxation, there is a "categorical bar" against states imposing a tax directly on Indians for activity in their Indian country. *Wagnon*, 546 U.S. at 122 & n.7 (2005); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) ("[W]hen a [s]tate attempts to levy a tax directly on an Indian tribe or its members inside Indian country . . . we have employed . . . a more categorical approach: Absent cession of jurisdiction or other federal statutes permitting it . . . a [s]tate is without power to tax reservation lands and reservation Indians." (quotations omitted)).

---

[6]*Colville*, 447 U.S. at 138.

Conversely, when Indians ("who") act outside of their own Indian country ("where"), including within the Indian country of another tribe, they are subject to non-discriminatory state laws otherwise applicable to all citizens of the state. *See Mescalero Apache Tribe*, 411 U.S. at 148-49; *see Colville*, 447 U.S. at 161. Thus, when the legal incidence of a tax falls on an Indian engaged in an activity outside of his or her Indian country, we need not apply the *Bracker* test to determine whether the preemption barrier prevents the state from applying the tax. *Wagnon*, 546 U.S. at 99.

Finally, the "[m]ore difficult question[]" arises when a state asserts authority over the conduct of non-Indians ("who") in Indian country ("where"). *Bracker*, 448 U.S. at 144. In these cases, we must examine whether either the preemption or the infringement barrier prevents the state from applying its law. Unlike when Indians are acting in their own Indian country, no categorical bar operates to prohibit a state tax. *Chickasaw Nation*, 515 U.S. at 459. Instead, the Supreme Court has repeatedly found that the preemption and infringement barriers do not prevent the state from taxing non-Indians in Indian country so long as the tax imposes only minimal burdens on the Indians. *See Dep't of Taxation and Finance of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994); *Colville*, 447 U.S. at 159; *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 482-83 (1976).

#### d. *The Indian Trader Statutes*

Intertwined in many of the state taxation cases are claims that the Indian Trader Statutes, 25 U.S.C. §§ 261-264, preempt a state tax. Congress enacted the Indian Trader

Statutes "to prevent fraud and other abuses by persons trading with Indians." *Milhelm Attea*, 512 U.S. at 70. They impose sanctions against non-Indians who attempt to introduce goods for trade on a reservation without first obtaining a license from the Commissioner of Indian Affairs, 25 U.S.C. § 264, and provide that the "Commissioner . . . shall have the sole power and authority to appoint traders to the Indian tribes and to make rules and regulations . . . specifying the kind and quantity of goods and the prices at which such goods should be sold to the Indians," 25 U.S.C. § 261.

The effect of the Indian Trader Statutes on state taxation differs depending again on the "who" and the "where" involved. In *Warren Trading Post Co. v. Arizona State Tax Commission*, 380 U.S. 685 (1965), the Supreme Court concluded that the Indian Trader Statutes barred the state from imposing a tax on the gross sale proceeds of licensed Indian traders dealing with Indians in their Indian country. *Id.* at 690-92. The Court stated: "These apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Id.* at 690. Although *Warren Trading Post* suggests that there is little room for state taxation, that case involved transactions with Indians in Indian country, not transactions with non-Indians. *See id.* at 691-92 ("Insofar as they are applied to this federally licensed Indian trader with respect to sales made to reservation Indians on the reservation, t[h]ese state laws imposing taxes cannot stand.").

In *Milhelm Attea*, the Court examined whether the Indian Trader Statutes

-24-

preempted a state tax applied to non-Indians in Indian country and narrowed its interpretation of the Indian Trader Statutes. Applying the "particularized inquiry" from *Bracker* and balancing state, tribal, and federal interests, the Court found that the Indian Trader Statutes did not preempt a state cigarette excise tax. *Milhelm Attea*, 512 U.S. at 73-75; *Colville*, 447 U.S. at 155-56 ("The Indian traders statutes incorporate a congressional desire comprehensively to regulate businesses selling goods to reservation Indians for cash or exchange, but no similar intent is evident with respect to sales by Indians to nonmembers of the Tribe." (citations omitted)). We reached a similar result in *Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566 (10th Cir. 2000), where we found that the Indian Trader Statutes did not preempt a state fuel tax law that imposed a tax on fuel distributors rather than Indians. *Id.* at 582-83.

### e. Supreme Court Cases

We do not write this opinion on a blank slate. The Supreme Court has examined state cigarette tax laws that are similar to Oklahoma's on numerous occasions. In *Moe v. Confederated Shalish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976), the Court reviewed whether a state could apply its cigarette tax to an Indian who operated a retail smoke shop in Indian country. The Court held that the state did not have the authority to tax the tribal retailer's sales to Indians, but that it did have the authority to tax sales to non-Indians. *Id.* at 480-81, 482-83. The Court stated:

> The State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller

-25-

will avoid payment of a concededly lawful tax. Since this burden is not, strictly speaking, a tax at all, it is not governed by [cases] dealing with the 'special area of state taxation.' We see nothing in this burden which frustrates tribal self-government or runs afoul of any congressional enactment dealing with the affairs of reservation Indians.

*Id.* at 483 (citations omitted).

Four years later, the Court again addressed whether a state could apply its cigarette and tobacco product taxes to on-reservation Indian retailers in *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980). The Court made several important holdings in *Colville*. First, it held that the cigarette taxes, as applied to non-Indians, were not preempted by federal law, including the Indian Trader Statutes. *Id.* at 155-56. Second, it held that requiring tribal retailers to affix tax stamps, collect a tax from non-Indian purchasers, and keep detailed records were permissible minimal burdens that the state could impose on the tribal retailer. *Id.* at 159-60. Third, it held that the state could impose the tax on non-tribal member Indians. *Id.* at 161. Finally, it held that the state had the power to seize unstamped cigarettes en route to the reservation. *Id.* at 161-62. It stated:

> Although the cigarettes in transit are as yet exempt from state taxation, they are not immune from seizure when the Tribes, as here, have refused to fulfill collection and remittance obligations which the State has validly imposed. It is significant that these seizures take place outside the reservation, in locations where state power over Indian affairs is considerably more expansive than it is within reservation boundaries. By seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests.

*Id.* (citation omitted).

The Supreme Court's most recent significant analysis of this issue came in

*Department of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.*, 512

U.S. 61 (1994). In *Milhelm Attea*, the Court decided whether the Indian Trader Statutes

preempted a state cigarette tax. Primarily relying on *Moe* and *Colville*, the Court

answered no. *Id.* at 75. The Court also held that the state's quota on tax-free cigarettes to

be sold to Indians, a precollection requirement, and its recordkeeping requirements were

permissible. *Id.* at 75-76.

These opinions provide the basis for our decision.

## B. Application to MCN's Claims

We now turn to whether MCN failed to state a claim under Fed. R. Civ. P.

12(b)(6). We analyze whether the statutes at issue are preempted under federal law or

violate tribal sovereignty.

### 1. Excise Tax Statute

Because the excise tax falls on non-Indians purchasing cigarettes and other

tobacco products in Indian country,[7] we must analyze both potential barriers to its

application—preemption and infringement on tribal self-government. We hold that MCN

failed to state a plausible claim that the Excise Tax Statute is either preempted by federal

---

[7]Okla. Stat. tit. 68, § 302 states that the impact of the tax is on "the vendee, user, consumer, or possessor of cigarettes in [Oklahoma] . . . and shall . . . be . . . recovered from the ultimate consumer or user." "[S]uch 'dispositive language' from the state legislature is determinative of who bears the legal incidence of a state excise tax." *Wagnon*, 546 U.S. at 102 (quoting *Chickasaw*, 515 U.S. at 461).

law or infringes on MCN's tribal self-governance.

### a. Preemption

Each time the Supreme Court has examined whether federal law preempts taxes on non-Indians who purchase cigarettes in Indian country, the Court has found that it does not. *See, e.g.*, *Milhelm Attea*, 512 U.S. at 78; *Colville*, 447 U.S. at 157; *Moe*, 425 U.S. at 483. These decisions establish that the state has a valid interest in collecting revenue. *Colville*, 447 U.S. at 157 ("The State also has a legitimate governmental interest in raising revenue" through taxes.). They also establish that: "[t]ribes have no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all." *Colville*, 447 U.S. at 151 n.27. Thus, the Court has found that tribal interests do not outweigh those of the state in this area.

In *Milhelm Attea*, the Supreme Court addressed whether the Indian Trader Statutes preempted a New York cigarette law similar to the Excise Tax Statute at issue here. 512 U.S. at 70. The Court summarized its prior cases involving state taxation of cigarettes in Indian country and applied them to the "particularized inquiry" and balancing required under *Bracker*. *Id.* at 73. It stated:

> *Moe, Colville*, and [*Oklahoma Tax Com'n v. Citizen Band*] *Potawatomi* [*Indian Tribe of Oklahoma*, 498 U.S. 505 (1991),] make clear that the [s]tates have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchase of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere. The balance of state, federal and tribal interests in this area thus leaves more room for state regulation than in others.

*Id.* (quotations omitted) (citation omitted). The Court concluded that the Indian Trader

Statutes did not preempt "circumvention of 'concededly lawful' taxes owed by non-

Indians." *Id.* at 75 (quoting *Moe*, 425 U.S. at 482-83); *see also Colville*, 447 U.S. at 155-

56 ("The Indian Trader Statutes incorporate a congressional desire comprehensively to

regulate businesses selling goods to reservation Indians for cash or exchange but no

similar intent is evident with respect to sales by Indians to nonmembers of the Tribe."

(citations omitted)).

The Supreme Court has concluded that a state's interest in collecting its lawful tax

outweighs a tribe's interest in selling tax-exempt cigarettes to non-tribal members who

might normally shop elsewhere but for the discounted prices.[8] Accordingly, we see no

reason why, under the backdrop principles of tribal self-government, MCN's interest in

being free from state regulation outweighs the State's interest in collecting its valid tax.

---

[8]MCN argues that it is inappropriate for us to perform the "particularized inquiry" and balance the federal, state, and tribal interests because this case comes to us from the grant of a motion to dismiss. It wishes to develop the record regarding its interest in being free from the Excise Tax. Although we remanded in *Sac & Fox Nation* to allow the tribe an opportunity to provide more information to aid us in performing the balancing preemption test, 213 F.3d at 585-86, we need not do so here. The considerations to do so in *Sac & Fox Nation*, such as needing to ascertain the portion of fuel sales made to tribal members compared to the general public, *id.* at 585, are not present in this case. The Supreme Court has already conclusively addressed the validity of taxes nearly identical to the excise tax here, and found that tribes do not have an interest in marketing an exemption from valid state taxes. *See Colville*, 447 U.S. at 155 ("We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.").

Therefore, we hold that the Indian Trader Statutes do not preempt the Excise Tax Statute.

### b. Tribal Self-Governance

We also must consider whether the Excise Tax Statute violates MCN's tribal sovereignty—the right to "make [its] own laws and be ruled by them." *Williams*, 358 U.S. at 220. "[T]ribal sovereignty does not completely preclude States from enlisting tribal retailers to assist enforcement of valid state taxes . . . ." *Milhelm Attea*, 512 U.S. at 74. A state may impose "minimal burdens" on Indians to collect cigarette taxes from non-Indians for transactions occurring in Indian country. *Moe*, 425 U.S. at 483 ("The State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax. . . . We see nothing in this burden which frustrates tribal self-government . . . ."); *see also Potawatomi*, 498 U.S. at 513, 512 ("[T]he doctrine of tribal sovereign immunity does not prevent a State from requiring Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the Tribe." It also "does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes.").

In *Moe*, the Supreme Court determined that a state could require tribal retailers to collect a tax on the sale of cigarettes to non-Indians. 425 U.S. at 482-83 (rejecting the tribe's contention that making "the Indian retailer an 'involuntary agent' for collection of taxes owed by non-Indians is a 'gross interference with (its) freedom from state

-30-

regulation'").  In *Colville*, the Court upheld more extensive burdens such as requiring tribal retailers to keep detailed records of both taxable and nontaxable transactions because such requirements were a "reasonably necessary . . . means of preventing fraudulent transactions."  447 U.S. at 159-60.  Finally, in *Milhelm Attea*, the Court upheld New York's probable demand formula for determining a quota of the tax-free cigarettes for tribal members, as well as precollection and recordkeeping requirements.  512 U.S. at 75-76 (noting that these requirements do not intrude on the Indians' "core tribal interests" (quoting *Colville*, 447 U.S. at 162)).

The burdens that the Excise Tax Statute place on MCN's tribal retailers do not exceed the permissible "minimal burdens" upheld in *Moe*, *Colville*, and *Milhelm Attea*. Apart from the legal incidence of the excise tax that falls on non-Indian consumers, the principal burden of the Excise Tax Statute falls on the OTC-licensed cigarette and tobacco wholesalers who must purchase and affix the tax and tax-free stamps, maintain detailed records, and precollect some taxes.  None of these burdens fall on MCN's tribally-licensed retailers.  Even if these burdens did fall on MCN's tribal retailers, *Moe*, *Colville*, and *Milhelm Attea* instruct us that such burdens are permissible.

MCN, however, argues that the Excise Tax Statute indirectly burdens the tribe and interferes with its tribal self-governance.  We will address MCN's four arguments in turn.

### i.    *OTC-Licensed Wholesalers*

The Excise Tax Statute requires tribally-licensed retailers to purchase cigarettes and other tobacco products from OTC-licensed wholesalers.  Thus, if MCN wishes to

-31-

operate a tribal wholesaler and distribute cigarettes and other tobacco products to tribally-licensed retailers, that wholesaler must be licensed by the OTC. MCN argues that these requirements infringe on its tribal self-government because it cannot obtain cigarettes or other tobacco products without either doing business with other OTC-licensed wholesalers or having its tribal wholesaler obtain a license from the OTC.

Although some authority suggests that the State cannot require MCN's tribally operated wholesaler to obtain a license from the OTC, *see Moe*, 425 U.S. at 480-81 (prohibiting vendor license fee as applied to tribal member conducting business on Indian country); *State ex rel. Okla. Tax Comm'n v. Bruner*, 815 P.2d 667, 669-70 (1991) (prohibiting the OTC from imposing a license and permit requirement on tribally licensed cigarette retailers in Indian country but permitting a registration requirement), in *Rice v. Rehner*, 463 U.S. 713 (1983), the Supreme Court held that where a tribal retailer sells to non-tribal members, state licensing requirements do not "infringe upon tribal sovereignty." *Id.* at 720 ("To the extent that [the Indian trader] seeks to sell to non-Indians, or to Indians who are not members of the tribe with jurisdiction over the reservation on which the sale occurred, the decisions of this Court have already foreclosed [the Indian trader's] argument that the licensing requirements infringe upon tribal sovereignty.").

Even if we were to question such a licensing requirement, MCN provides no authority for why the State cannot require it to purchase cigarettes and other tobacco products from an OTC-licensed wholesaler. The precedent on this question goes the

other way.  In *Milhelm Attea*, the New York statutory scheme that the Court reviewed required "licensed agents [to] purchase tax stamps and affix them to cigarette packs in advance of the first sale within the State."  512 U.S. at 64.  Requiring wholesalers, who are the stamping agents, to be OTC-licensed helps protect the State's valid interest in preventing evasion of its valid cigarette tax.  *See Id.* at 75 ("We are persuaded . . . that [the State's] decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream is a 'reasonably necessary' method of 'preventing fraudulent transactions,' one that 'polices against wholesale evasions of [the State's] own valid taxes without unnecessarily intruding on core tribal interests.'" (quoting *Colville*, 447 U.S. at 162)).  Therefore, we hold that either requiring MCN's wholesaler to obtain a license from the OTC or requiring its tribally-licensed retailers to purchase cigarettes and other tobacco products from OTC-licensed wholesalers does not infringe on MCN's tribal self-government.

### ii.    *Probable Demand*

MCN argues that the Excise Tax Statute impermissibly restricts the number of tax-free stamps that an OTC-licensed wholesaler may receive from the OTC.  The Supreme Court addressed this argument in *Milhelm Attea*, where the petitioners, federally-licensed Indian traders, challenged a New York statute that had a similar probable demand formula for the distribution of tax-free cigarettes.  512 U.S. at 75-76.  Because the Indian traders had brought a facial challenge to the statute, the Court refused to consider "consequences that, while possible, are by no means predictable."  512 U.S. at 69.  Thus,

-33-

it rejected the Indian traders' challenge to the limitation of tax-free cigarettes based on the probable demand mechanism. *Id.* at 75. The Court stated:

> While the possibility of an inadequate quota may provide the basis for a future challenge to the *application* of the regulations, we are unwilling to assume, in the absence of any such showing . . . that [the State] will underestimate the legitimate demand for tax-free cigarettes. . . . This procedure should not prove unduly burdensome absent wrongful withholding or delay of approval—problems that can be addressed if and when they arise.

*Id.* at 75-76.

Like the petitioner in *Milhelm Attea*, MCN has not alleged that wholesalers, and as a result, its tribally-licensed retailers, are not receiving a sufficient amount of cigarettes with the tax-free stamps. Thus, "we are unwilling to assume, in the absence of any such showing" that the State will underestimate the amount of tax-free cigarettes to send to wholesalers. *See id*. at 75-76.

Furthermore, MCN does not address the provision in the Excise Tax Statute that permits the tribe to comment on the initial calculation of the probable demand or the provision that allows wholesalers to request more tax-free stamps or other tobacco products provided the wholesaler and/or the tribe establish "good cause shown by verifiable information." Okla. Stat. tit. 68, §§ 349.1(C)(5); 349.1(D)(5). For these reasons, we do not find that the probable demand quota is an impermissible burden.

### iii. *Financial Disincentive*

MCN argues that the method by which the Excise Tax Statute is applied to tobacco products other than cigarettes creates a financial disincentive for OTC-licensed

wholesalers to do business with MCN. The OTC-licensed wholesalers must bear the initial incidence of the excise tax and receive a refund at the end of the month equal to the lesser of 1/12 of their allocated share of the probable demand or their verifiable tax-free sales to tribally-licensed retailers, *see* Okla. Stat. tit. 68, § 349.1(D)(5). The Supreme Court, however, has held that a tax on non-Indians "may be valid even if [the tax] seriously disadvantages or eliminates the Indian retailer's business with non-Indians." *Colville*, 447 U.S. at 151; *see also Wagnon*, 546 U.S. at 114 ("But the Nation cannot invalidate the [state] tax by complaining about a decrease in revenues."). The Court has never "go[ne] so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses in a State." *Colville*, 447 U.S. at 155. Thus, even if the application of the Excise Tax Statute to other tobacco products disadvantages MCN's tribally-licensed retailers, it does not infringe on MCN's tribal self-governance.

### iv. *Seizures Outside MCN's Indian Country*

MCN complains that the State's practice of enforcing the Excise Tax Statute by seizing cigarettes outside Indian country that do not have a tax or tax-free stamp infringes on its tribal sovereignty. The Supreme Court again instructs us otherwise. Such seizures are permissible, especially when, as here, a tribe fails to cooperate and collect valid state taxes on sales of cigarettes to non-tribal members on Indian country. *See Colville*, 447 U.S. at 161-62. In *Colville*, the Court stated:

> Although the cigarettes in transit are as yet exempt from state taxation, they

are not immune from seizure when the Tribes, as here, have refused to fulfill collection and remittance obligations which the State has validly imposed. . . . By seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests.

*Id.* at 161-62 (citation omitted). The Supreme Court reaffirmed this view in *Potowatomi*: "States may of course collect the sales tax from cigarette wholesalers . . . by seizing unstamped cigarettes off the reservation." 498 U.S. at 514; *see also Muscogee I*, 611 F.3d at 1237 (collecting cases). The State's seizure of unstamped cigarettes to enforce the Excise Tax Statute is accordingly not an impermissible burden on MCN.

For these reasons, we hold that the Excise Tax Statute does not violate MCN's right to "make [its] own laws and be ruled by them." *Williams*, 358 U.S. at 220.

\* \* \*

Based on Supreme Court precedent, we hold that MCN has failed to state a plausible claim that the Excise Tax Statute is not valid and enforceable based either on preemption or on infringement of MCN's right of tribal self-government.

### 2. *Escrow Statute and Complementary Act*

MCN also fails to state a plausible claim that the Escrow Statute and the Complementary Act are invalid and unenforceable. These provisions are non-discriminatory state laws of general application and do not specifically pertain to Indian tribes, tribal members, or Indian country. We briefly review the two statutes.

The Escrow Statute requires tobacco product manufacturers that do not participate in the Master Settlement Agreement to make payments into a qualified escrow fund.

-36-

Okla. Stat. tit. 37, §§ 600.21(D), 600.23(A). The manufacturer is responsible to make the payments. *See id*. § 600.23(A)(2) ("Any tobacco product manufacturer [not participating in the MSA] . . . shall . . . [p]lace into a qualified escrow fund . . . the following amounts . . . ."). Although the manufacturers might ultimately pass this burden on to consumers, the legal incidence of the Escrow Statute falls on the manufacturers. *See Chickasaw*, 515 U.S. at 459-60 (explaining that the legal incidence of a tax rather than its economic reality is determinative).

The Complementary Act requires a tobacco product manufacturer to certify with the OTC and the Oklahoma Attorney General that it is either a party to the MSA or that it has made the required payments to the escrow fund. Okla. Stat. tit. 68, § 360.4(A). The Attorney General maintains a directory of all complying manufacturers and their brand families. *Id.* § 360.4(B)(1). The Act makes it unlawful to "[s]ell, offer, or possess for sale, in [Oklahoma], or import for personal consumption in [Oklahoma], cigarettes of a tobacco product manufacturer or brand family not included in the [Attorney General's] directory." *Id.* § 360.4(C)(2). Such cigarettes are considered contraband and are subject to seizure and forfeiture. *Id*. § 360.7(B).

The purpose of the Complementary Act is to enforce compliance with the Escrow Statute. *Id*. § 360.2. It states:

> The Oklahoma Legislature declares that violations of [the Escrow Statute] threaten the integrity of the [MSA] . . . , the fiscal soundness of the state, and the public health. The Legislature declares that enacting this act enhances the Prevention of Youth Access to Tobacco Act [which includes the Escrow Statute] by preventing

violations and aiding in the enforcement of the [Complementary Act] and thereby safeguard the [MSA], the fiscal soundness of the state, and the public health.

*Id*. (footnotes omitted); *see also* Aplt. Br. at 33 ("The primary focus of this registration requirement is that [the manufacturer] must certify that it is in full compliance with the Escrow Statute.").

In sum, the Escrow Statute and the Complementary Act focus on tobacco product manufacturers. The Escrow Statute requires manufacturers to join the MSA or pay into the escrow fund. The Complementary Act seeks to secure manufacturers' compliance with the Escrow Statute by requiring them to register with the Attorney General and the OTC.

MCN argues that the Escrow Statute and Complementary Act unlawfully regulate MCN and unduly interfere with its members' ability to buy cigarette brands of their choosing. We disagree. The Escrow Statute and Complementary Act do not directly regulate MCN, nor do they indirectly regulate MCN in an impermissible manner.

The Escrow Statute and Complementary Act do not directly regulate MCN for two reasons. First, MCN is not a tobacco product manufacturer and does not allege that any MCN businesses or tribal members are manufacturers. MCN thus cannot, and does not, claim that it is required to make payments into the escrow fund.

Second, MCN's complaint does not allege that the State has enforced or threatened to enforce the Complementary Act in MCN's Indian country. It alleges

instead such enforcement of the Excise Tax Statute.  Even this allegation is vague.[9]  The

complaint makes no allegation that the State has seized non-directory cigarettes in

MCN's Indian country or taken enforcement actions there due to noncompliance with the

Complementary Act.  Thus, MCN has failed to state a plausible claim based on

Complementary Act enforcement in MCN's Indian country.[10]  *See Iqbal*, 129 S. Ct. at

---

[9]Compl. ¶ 79 ("The State has informed the Nation that it intends to enforce SB 608, specifically section 349.1 [—*the Excise Tax Statute*—] within Indian country . . . ."); *id.* ¶ 88 ("Defendants have taken and threaten to continue to take enforcement actions against Plaintiffs, their employees, agents and privies, including seizures of inventory *that do not bear an Oklahoma State cigarette stamp.*" (emphasis added)); *id.* ¶ 124 ("The State has unlawfully seized cigarettes *in transit to the Indian country* of the Nation in violation of federal law." (emphasis added)); *id.* ¶ 127 ("The State *through SB 608* has adopted civil and criminal penalties that it threatens to enforce within the jurisdiction of the Nation in violation of federal law." (emphasis added)); *id.* ¶ 155 ("The State has demonstrated a pattern and practice of selective enforcement of the Tax Code against Nation members and licensees of the Nation within Indian country, including the targeting of the Nations vehicles and common carriers transporting tobacco products *to and from the Indian country of the Nation*." (emphasis added)).  SB 608, which became effective January 1, 2010, enacted the Excise Tax Statute.  MCN appears to refer to SB 608 and Okla. Stat. tit. 68, § 349.1—the Excise Tax Statute—interchangeably.

[10] Even if MCN alleged that the State has threatened to enforce the Complementary Act against tribal members on its Indian country, it is not clear that the State has such enforcement authority.  Absent an express statement by Congress, a state may not "assert jurisdiction over the on-reservation activities of tribal members" except in "exceptional circumstances."  *Mescalero Apache Tribe*, 462 U.S. at 331-32; *see also Bracker*, 448 U.S. at 144 ("When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable . . . ."); *Williams*, 358 U.S. at 220 ("[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.").  We are unaware of such a statement by Congress expressly permitting Oklahoma to assert such jurisdiction here.  *See Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 981 (10th Cir. 1987); *see also Ross v. Neff*, 905 F.2d 1349, 1352-53 (10th Cir. 1990).

1950.

MCN finally, and primarily, argues that the State's seizures of unstamped cigarettes outside Indian country indirectly and impermissibly affect the tribe by restricting which brands tribal members can buy inside Indian country. *See* Compl. ¶ 123; Aplt. Br. at 37 ("[The Complementary Act] dictates the type of products that a tribally-owned wholesaler or retailer in Indian country may sell to tribal members."). This effect, MCN contends, renders the Escrow Statute and Complementary Act invalid and unenforceable based on preemption and infringement of tribal sovereignty. We disagree.

MCN fails to identify a single brand of cigarettes that its members cannot purchase due to the Complementary Act. But even if the Act and the State's off-Indian country enforcement of it affect tribal members' choice of contraband cigarettes, this collateral consequence cannot support a claim.

According to the Supreme Court, such ancillary effects arising from enforcement of nondiscriminatory state laws outside Indian country do not call for a *Bracker* preemption analysis. *See Wagnon*, 546 U.S. at 112-14. In *Wagnon*, the Court refused to perform a *Bracker* preemption analysis based on the "downstream . . . consequences" visited upon tribal members on Indian country of a nondiscriminatory state tax applied to nonmembers outside Indian country. *Id.* at 114. These "downstream . . . consequences" also did not infringe on tribal sovereignty. *Id.* at 115 & n.6.

In explaining why the *Bracker* preemption analysis does not apply when a state

law is applied outside Indian country, the *Wagnon* Court emphasized the "geographical component of tribal sovereignty." *Id.* at 112. The Court relied on the principle that "'[a]bsent express federal law to the contrary, Indians going beyond the reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State.'" *Id.* at 122-23 (quoting *Mescalero Apache Tribe*, 411 U.S. at 148-49). "[I]t follows," the Court said in *Wagnon*, "that [a state] may apply a nondiscriminatory tax where . . . the tax is imposed on non-Indians as a result of an off-reservation transaction." 546 U.S. at 113. It then concluded that "application of the [*Bracker*] test . . . is . . . inconsistent with the special geographic sovereignty concerns that gave rise to that test." *Id.*; *see also Bracker*, 448 U.S. at 151 ("[T]here is a significant geographical component to tribal sovereignty . . . though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits.").

Because the Escrow Statute and Complementary Act are enforced outside MCN's Indian country and any resulting "consequences" are "downstream," we need not perform a *Bracker* preemption analysis. And even if MCN is arguing that the Indian Trader Statutes preempt the Escrow Statute and Complementary Act under a traditional preemption analysis, we conclude there is no such preemption.

The Indian Trader Statutes do not preempt these state laws under any theory of preemption—express or implied based on conflict or field preemption. *See Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011) (explaining the different

-41-

preemption approaches). Nothing in the Indian Trader Statutes specifically preempts the Escrow Statute or the Complementary Act. As for implied conflict preemption, MCN is unable, as are we, to show how the Indian Trader Statutes conflict with the Escrow Statute and Complementary Act.

MCN appears to argue that the Indian Trader Statutes preempt the field because they regulate trade with tribes and their members within Indian country. *See* Aplt. Br. at 30-31. But in *Milhelm Attea*, the Supreme Court stated that the Indian Trader Statutes do not "bar[] any and all state-imposed burdens on Indian traders . . . [and] do not bar the States from imposing reasonable regulatory burdens upon Indian traders for [enforcement of valid state taxes]." 512 U.S. at 74. And in *Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566 (10th Cir. 2000), "we conclude[d] that the Indian Trader Statutes do not so pervade the field that they preempt the [state tax], the legal incidence of which falls upon the distributors and which imposes only an indirect burden on the Tribes." *Id.* at 583. We see no basis for MCN's argument that the Indian Trader Statutes preempt the Escrow Statute and Complementary Act by occupying the field.

MCN's infringement of tribal sovereignty claim fails for reasons similar to the failure of its preemption claim. *Wagnon*'s conclusion that the indirect effects of the state law at issue in that case did not infringe on tribal sovereignty drew support from the numerous Supreme Court cases holding that tribal members acting outside their Indian country are subject to state law. *See Mescalero Apache Tribe*, 411 U.S. at 148-49 (taxation of gross receipts of an off-Indian country, tribally owned ski resort); *see also*

*Hicks*, 533 U.S. at 362 ("States have criminal jurisdiction over reservation Indians for crimes committed . . . off the reservation."); *Organized Village of Kake v. Egan*, 369 U.S. 60, 75 (1962) (state regulation of fishing outside Indian country); *Ward v. Race Horse*, 163 U.S. 504, 516 (1896) (Indian subject to state criminal laws relating to hunting).

Nondiscriminatory state laws of general application necessarily have some indirect effect on tribal members in Indian country. But, as *Wagnon* indicates, the Supreme Court has not found that application of state law outside Indian country infringes on tribal sovereignty.[11] In fact, the Court has upheld off-Indian country seizure of cigarettes pursuant to state law without even considering the effect of these seizures on tribal sovereignty. *See Potowatomi*, 498 U.S. at 514 ("States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores." (citations omitted)); *Colville*, 447 U.S. at 162 (approving of off-Indian country seizure of cigarettes to "police[] against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests"). And in *Muscogee I*, we held that the State's off-Indian country seizure of cigarettes did not infringe on MCN's tribal sovereignty. 611 F.3d at 1237.

---

[11]Allowing this case to proceed could open the door for tribes to challenge any nondiscriminatory state law of general application based on its incidental effect on tribal members on Indian country arising from off-Indian country enforcement. *Cf. Chickasaw*, 515 U.S. at 466 (tribes do not have "supersovereign authority to interfere with another jurisdiction's right to" enforce laws within its borders).

MCN offers no contrary authority. Its members' alleged inability to purchase particular brands of cigarettes is at most an indirect effect of the Escrow Statute and Complementary Act.[12] This indirect effect of requiring manufacturers to comply with a nondiscriminatory state law before their products can be sold in the state does not infringe on MCN's tribal sovereignty.

In sum, the Escrow Statute and Complementary Act regulate tobacco product manufacturers. Neither MCN nor any of its businesses manufacture such products. The State enforces these laws by seizing cigarettes outside Indian country. The alleged ancillary effect of these laws based on the State's off-Indian country enforcement of them, is that MCN's members cannot buy contraband cigarettes. But such an indirect effect does not establish a preemption or an infringement of tribal sovereignty claim. MCN therefore fails to state a plausible claim that the Escrow Statute and Complementary Act are preempted by federal law or infringe on its tribal sovereignty.

## V. CONCLUSION

We hold that the district court had subject matter jurisdiction over MCN's claims against the individual state defendants under *Ex parte Young*. We further hold that MCN's complaint fails to state a plausible claim. We need not determine whether the district court has subject matter jurisdiction over MCN's claims against the OTC because

---

[12]We also note that the Escrow Statute and Complementary Act are aimed at manufacturers. They do not prevent MCN from obtaining particular brands of cigarettes so long as the *manufacturer* complies with the Escrow Statute and Complementary Act.

MCN's failure to state a plausible claim against the individual state defendants foreordains the failure of its claims against the OTC. We affirm the district court's judgment dismissing MCN's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6).