**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 18, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PUEBLO OF POJOAQUE, a federally
recognized Indian tribe; JOSEPH M.
TALACHY, Governor of the Pueblo of
Pojoaque,

      Plaintiffs - Appellants,

v.

STATE OF NEW MEXICO; SUSANA
MARTINEZ; JEREMIAH RITCHIE;
JEFFERY S. LANDERS;
SALVATORE MANIACI;
PAULETTE BECKER; ROBERT M.
DOUGHTY, III; CARL E.
LONDENE; JOHN DOES I-V,

      Defendants - Appellees.

No. 16-2228

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:15-CV-00625-JB-GBW)**

---

Scott Crowell of Crowell Law Office, Tribal Advocacy Group (and Carrie A.
Frias of Pueblo of Pojoaque, Legal Department, Santa Fe, New Mexico, with him
on the brief), Sedona, Arizona, for Plaintiffs - Appellants.

Edward Ricco (and Krystle A. Thomas with him on the brief), Rodey, Dickason,
Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, for Defendants -
Appellees.

---

Before **KELLY**, **MURPHY**, and **BACHARACH**, Circuit Judges.

**KELLY**, Circuit Judge.

Plaintiffs-Appellants Pueblo of Pojoaque and its governor, Joseph M. Talachy, (collectively "the Pueblo") appeal from the district court's dismissal of its claim for declaratory and injunctive relief based on the State of New Mexico's alleged unlawful interference with Class III gaming operations on the Pueblo's lands. Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028 (D.N.M. 2016). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

Background

The Pueblo of Pojoaque is a federally recognized Indian Tribe that operates two gaming facilities on its lands: the Buffalo Thunder Resort & Casino and the Cities of Gold Hotel & Casino. In July 2005, the Pueblo and New Mexico executed a Class III gaming compact pursuant to § 2710(d) of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701–2721, that allowed it to operate casino-style gaming on its lands. This compact expired on June 30, 2015.

Before its expiration, the Pueblo sought to enter into a new compact with the State. After its initial efforts proved unsuccessful, the Pueblo sued New Mexico for failing to negotiate under IGRA in good faith. New Mexico asserted the defense of Eleventh Amendment immunity, and the district court dismissed the suit pursuant to Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996).

-2-

The Pueblo then submitted a Class III gaming proposal to the Secretary of the Interior ("the Secretary") pursuant to § 2710(d)(7) of IGRA and 25 C.F.R. § 291 ("Part 291"). IGRA allows the Secretary to establish Class III gaming procedures if a state refuses to agree to a compact, while the regulations in Part 291 indicated the Secretary could grant an Indian tribe permission to operate Class III gaming even without the state's consent in situations where there is no agreement and the state has asserted immunity from suit.

In August 2014, the State sued the Department of the Interior ("DOI"), challenging the Secretary's authority to promulgate the regulations in Part 291, and the Pueblo intervened. On summary judgment, the district court held that the Part 291 regulations were invalid and barred the Secretary from taking any further action on the Pueblo's request for the issuance of gaming procedures under the regulations. New Mexico v. DOI, No. 1:14-cv-00695-JAP/SCY, 2014 WL 10298036 (D.N.M. Oct. 17, 2014). The DOI and the Pueblo of Pojoaque subsequently appealed.[1]

On November 3, 2014, the Pueblo renewed compact negotiations with New Mexico. Again, meetings proved unsuccessful and no compact was reached.

Then, on February 26, 2015, the New Mexico Gaming Control Board ("the Gaming Board") sought to perform its annual compliance review of the Pueblo's

---

[1] This court affirmed the decision of the district court during the pendency of this appeal. New Mexico v. DOI, 854 F.3d 1207 (10th Cir. 2017).

-3-

gaming operations in early November.  But on May 6, the Gaming Board informed the Pueblo of its intent to conduct that review earlier (in advance of the expiration of the compact on June 30), and requested any and all contracts with gaming machine manufacturers, including lease, purchase, and service agreements.  The Pueblo complied on June 24.

On June 30, 2015, the compact expired at midnight.  That same day, the United States Attorney for the District of New Mexico stated that, although continued gaming operations after the expiration of the compact would violate federal law, he would withhold enforcement action for the duration of the appeal in New Mexico v. Department of the Interior.  The withholding of enforcement was conditioned on the Pueblo complying with the expiring compact and placing the funds it would otherwise pay the State in trust.  The Gaming Board then announced that the U.S. Attorney's decision allowing the Pueblo's gaming operations to continue "provides no protection to banks, credit card vendors, gaming machine vendors, advertisers, bondholders, and others that are now doing business with an illegal gambling enterprise."  Pueblo of Pojoaque, 214 F. Supp. 3d at 1044.

On July 15, 2015, the Gaming Board held a closed meeting to discuss issues regarding tribal gaming compliance.  It then announced its conclusion that the Pueblo's casinos were operating illegally due to the absence of a compact, and it placed in abeyance approval of any license application or renewal for vendors

who did business with the Pueblo. No other vendor's applications were placed in abeyance.

Three days later, the Pueblo commenced this action, asserting in part that New Mexico failed to conduct compact negotiations in good faith in violation of IGRA and that individual defendants conspired under the color of state law to "deprive the federal right of the Pueblo and its members to be free of state jurisdiction over activities that occur on the Pueblo lands." 1 Aplt. App. 17.

On September 9, 2015, the Gaming Board notified gaming manufacturer vendors doing business with the Pueblo that the Pueblo's continued gaming operations violated federal law according to the U.S. Attorney. The Gaming Board indicated that it would conduct an audit of the vendors' records to ensure compliance with state law and the Gaming Board's regulations. Accordingly, the Board requested production of the vendors' communications and business records with various casinos and tribal gaming operations, including the Pueblo's two Class III gaming facilities.

On September 25, 2015, the Gaming Board cited all vendors doing business with the Pueblo. That same day, the Pueblo sought an injunction, contending that the Gaming Board's issuance of letters and citations was an impermissible attempt to assert jurisdiction over gaming operations on tribal lands, despite the termination of New Mexico's jurisdiction over such activities upon the expiration of the compact.

On October 7, 2015, the district court granted the preliminary injunction and enjoined the State "from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement against any licensee in good standing with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee is conducting business with the Pueblo." Pueblo of Pojoaque v. New Mexico, No. 1:15-cv-0625 RB/GBW, 2015 WL 10818855, *10 (D.N.M. Oct. 7, 2015). New Mexico appealed the ruling, and the appeal was abated pending the issuance of a decision on the challenged regulations in 25 C.F.R. § 291.

Meanwhile, on October 21, 2015, the Gaming Board held a formal, public meeting, during which it considered 29 applications by vendors for gaming license renewals. The Board deferred all nine applications by vendors doing business with the Pueblo and did not set a date for future consideration. As for vendors not doing business with the Pueblo, the Board approved 18 applications, deferred one for a one-month period, and took no vote on another.

In response to the Gaming Board's actions, the Pueblo urged the court to issue an order to show cause why the Board should not be held in contempt of court for violating the preliminary injunction. According to the Pueblo, the Board's conduct in threatening those doing business with the Pueblo constituted an attempt to assert jurisdiction over gaming operations on Pojoaque lands. The district court denied the motion on April 21, 2016, holding that the Gaming

-6-

Board's license deferrals did not "threaten" the vendor applications within the meaning of the preliminary injunction. Pueblo of Pojoaque v. New Mexico, No. CIV 15-0625 JB/GBW, 2016 WL 3135644, *13–16 (D.N.M. Apr. 21, 2016).

The parties then filed additional motions, including the State's and the individual defendants' motions to dismiss, the rulings which form the basis of this appeal. Notably, the district court determined that the State's interlocutory appeal of the preliminary injunction did not divest the district court of jurisdiction to proceed to the merits of the case. Pueblo of Pojoaque, 214 F. Supp. 3d at 1093–96. It then dismissed the Pueblo's claims, concluding that IGRA does not preempt New Mexico's regulatory actions with respect to non-Indian, state-licensed vendors doing business with non-Indian gaming operators. Id. at 1096–109.[2] The district court entered final judgment, stayed the effects of the preliminary injunction, and issued an indicative ruling that it would vacate or dissolve the preliminary injunction on remand. See Fed. R. Civ. P. 62(c), 62.1.

Given the relief obtained, the State voluntarily dismissed its appeal from

_____

[2] The district court also determined that the Pueblo's claim for declaratory and injunctive relief "based on the Supremacy Clause" failed to state a claim because the Supremacy Clause alone is not a source of any federal rights. Pueblo of Pojoaque, 214 F. Supp. 3d at 1109–10. On appeal, the Pueblo argues that the claim was properly pled and is based on the inherent, equitable power of the courts to award equitable relief in connection with a federal statutory scheme absent congressional intent to foreclose such relief. See Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378 (2015); Tohono O'odham Nation v. Ducey, 130 F. Supp. 3d 1301 (D. Ariz. 2015). We do not reach this issue given our preemption analysis.

the preliminary injunction.  The Pueblo then sought to stay the district court's judgment and restore the preliminary injunction.  The district court declined to do so, but we entered and extended a temporary injunction against the State mirroring the preliminary injunction entered by the district court, i.e. "from taking any action that threatens, revokes, conditions, modifies, fines, or otherwise punishes or takes enforcement action against any licensee in good standing with the New Mexico Gaming Control Board based wholly or in part on grounds that such licensee is conducting business with the Pueblo of Pojoaque."  Order, <u>Pueblo of Pojoaque v. New Mexico</u>, No. 16-2228 (10th Cir. Mar. 14, 2017).

On appeal, the Pueblo argues that the district court did not have jurisdiction to proceed to the merits given the interlocutory appeal of the preliminary injunction and, even if it did, it erred in concluding that IGRA does not preempt New Mexico's regulatory action.  Our review is de novo.  <u>Dutcher v. Matheson</u>, 733 F.3d 980, 985 (10th Cir. 2013) (jurisdiction); <u>Ute Mountain Ute Tribe v. Rodriguez</u>, 660 F.3d 1177, 1185 (10th Cir. 2011) (preemption).

Discussion

**A.    Jurisdiction**

The parties dispute whether New Mexico's appeal of the preliminary injunction divested the district court of jurisdiction.  As we stated in <u>Free Speech v. Federal Election Commission</u>, where there is "an appeal from an order granting

or denying a preliminary injunction, a district court may nevertheless proceed to determine the action on the merits." 720 F.3d 788, 791 (10th Cir. 2013) (quoting United States v. Price, 688 F.2d 204, 215 (3d Cir. 1982)). Asserting jurisdiction "is desirable 'both in the interest of expeditious disposition and in the face of uncertainty as to the extent to which the court of appeals will exercise its power.'" Id. at 792 (quoting 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3921.2 (3d ed. 1998)). Thus, the district court could reach the merits even though the preliminary injunction was pending on appeal.

To argue otherwise, the Pueblo relies upon Stewart v. Donges, 915 F.2d 572 (10th Cir. 1990), and its progeny. But these cases do not dictate a contrary result. Stewart held that an interlocutory appeal from the denial of summary judgment based on qualified immunity divested the district court of jurisdiction to proceed to the merits and conduct a trial. Id. at 574. But unlike Free Speech, Stewart focused on interlocutory appeals from orders refusing to dismiss on qualified immunity or double jeopardy grounds — situations in which the appeal relates to the entire action, as a reversal by an appellate court would mean that no further action could be taken against the defendant. See id. at 576. That is not the case here.

**B.    Preemption**

The parties dispute whether IGRA preempts the State's actions that form

the basis for the Pueblo's suit.  In response to the Supreme Court's holding in United Keetoowah Band of Cherokee Indians v. Oklahoma ex rel. Moss, 927 F.2d

California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 (1987), that

states lack regulatory authority over Indian gaming on tribal lands absent

congressional action, Congress enacted IGRA, 25 U.S.C. §§ 2701–2721, to

provide a role for states in regulating Indian gaming activities on tribal lands.

United Keetoowah Band of Cherokee Indians v. Oklahoma ex rel. Moss, 927 F.2d

1170, 1176 (10th Cir. 1991).  The Act divides Indian gaming into three classes.

25 U.S.C. § 2703(6)–(8).  This case concerns Class III gaming, which

encompasses the most remunerative gaming activities, such as slot machines and

casino games, and is subject to the most state oversight.  See Seminole Tribe, 517

U.S. at 48.

IGRA provides that Class III gaming activities "shall be lawful on Indian

lands only if such activities are . . . conducted in conformance with a Tribal-State

compact entered into by the Indian tribe and the State [in which such lands are

located] . . . that is in effect."  25 U.S.C. § 2710(d)(1)(C).  An Indian tribe

seeking a Class III gaming compact "shall request the State . . . to enter into

negotiations for the purpose of entering into a Tribal-State compact governing the

conduct of gaming activities.  Upon receiving such a request, the State shall

negotiate with the Indian tribe in good faith to enter into such a compact."  Id.

§ 2710(d)(3)(A).

Only the federal government can impose criminal or other sanctions against

-10-

allegedly-illegal gaming on tribal lands in the absence of a tribal-state compact. See 18 U.S.C. § 1166(d); United Keetoowah, 927 F.2d at 1177. This is true even though IGRA's penal provision incorporates state law as the federal law governing nonconforming gambling on tribal lands. Because IGRA preempts the field of governance of gaming activities on tribal lands, a state has no jurisdiction to directly regulate such gaming in the absence of a compact that provides such oversight. See United Keetoowah, 927 F.2d at 1177–79.

The Pueblo claims that IGRA preempts the regulatory action at issue. According to the Pueblo, the absence of a Tribal-State compact demonstrates that New Mexico has no regulatory authority on tribal lands. The Pueblo argues that the district court erred in conducting a traditional preemption analysis and in viewing this case as one that concerns actions performed outside of Indian territory. Even given a state's "capacious" authority to regulate off-reservation Indian gaming, Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024, 2034 (2014), the Pueblo insists that a state cannot take regulatory action that interferes with gaming on Indian lands. New Mexico responds that IGRA does not preempt New Mexico's regulatory conduct because IGRA does not expressly or impliedly preempt a state's off-reservation regulation of gaming licensees in their dealings with non-Indian gaming operators.

For the following reasons, we conclude that the district court properly applied the traditional preemption analysis to determine that IGRA does not

preempt the State's actions.

### 1.    *The Traditional Preemption Analysis Applies*

The Pueblo contends that a non-traditional, or <u>Bracker</u>, preemption analysis should apply — an argument New Mexico does not directly rebut and the district court did not address.  This type of preemption arises in the context of state taxation, and the Supreme Court has not yet applied it in the IGRA context.

In <u>White Mountain Apache Tribe v. Bracker</u>, the Supreme Court held that federal law preempted Arizona's taxation of the logging activities of non-Indians conducted exclusively within tribal land.  448 U.S. 136, 137–38 (1980).  There, the Court instructed that courts should not apply the traditional preemption analysis to assess whether federal law preempts state law as applied to tribal lands and tribal members, because "[t]ribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other."  <u>Id.</u> at 143.  Instead, courts should conduct "a 'particularized inquiry into the nature of the state, federal, and tribal interests at stake' and balance those interests under the 'backdrop' of Indian sovereignty."  <u>Muscogee (Creek) Nation v. Pruitt</u>, 669 F.3d 1159, 1170 (10th Cir. 2012) (quoting <u>Bracker</u>, 448 U.S. at 143, 145).  "Under this balancing test, state jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify

-12-

the assertion of state authority." Id. at 1170–71 (alterations, citation, and internal quotation marks omitted).

In Wagnon v. Prairie Band Potawatomi Nation, the Supreme Court reversed this court's decision in Prairie Band Potawatomi Nation v. Richards, 379 F.3d 979 (10th Cir. 2004), and held that the interest-balancing test applies "exclusively to *on-reservation* transactions between a nontribal entity and a tribe or tribal member." 546 U.S. 95, 112 (2005). The Court emphasized the importance of establishing bright-line standards, albeit in a tax administration context. Id. at 113.

As the Pueblo recognizes, the pertinent question is not from where the State is regulating, but whether the State is regulating Indian gaming on tribal lands. If New Mexico is regulating gaming on tribal land, then the Bracker balancing test applies. If not, then the traditional preemption analysis applies.

In the abstract, the Pueblo's argument that the State is regulating gaming on tribal lands might have facial appeal. If New Mexico's regulatory actions had the effect of shutting down gaming on Indian lands, then the State's conduct is little different than if the State had shut down the Indian gaming directly, which it indisputably cannot do. But the cases on which the Pueblo relies involve much more direct State regulatory action on Indian lands.[3] Moreover, it is undisputed

---

[3] E.g., Alabama v. PCI Gaming Auth., 801 F.3d 1278 (11th Cir. 2015) (affirming the dismissal of an action by Alabama to enjoin on-reservation casino

-13-

that New Mexico is not directly regulating the Pueblo by, for example, storming

into the casinos and seizing gaming equipment, as occurred in Wyandotte Nation

v. Sebelius, 443 F.3d 1247, 1251–52 (10th Cir. 2006).  And, by all accounts, New

Mexico's regulatory action as to the licensees only directly affects the licensees'

business dealings with gaming facilities outside of Indian lands, not the licensees'

dealings with the Pueblo.  Aplee. Br. at 7 & n.1; 1 Aplee. Supp. App. 31–32.   As

the Pueblo has acknowledged, state-issued licenses simply are not required to

conduct business with gaming facilities on Indian lands.  Aplee. Supp. App.

31–32.  Plainly, the State is regulating gaming not on Indian lands, but off those

lands, notwithstanding the indirect effects on tribal gaming.

Thus, the relevant inquiry is whether the indirect effects on tribal gaming

are sufficient to trigger the Bracker preemption analysis.  We find persuasive

precedent in the Indian taxation context that has rejected indirect-consequence

arguments and allowed the states to exercise authority even where doing so

affects tribal activity on tribal lands.

---

operations); Wyandotte Nation v. Sebelius, 443 F.3d 1247 (10th Cir. 2006)
(affirming the grant of an injunction to a tribe after Kansas sent armed officials to
storm and seize files, gambling proceeds, and gaming machines from a casino
located in land held in trust by the Secretary for the tribe); United States v.
Sisseton-Wahpeton Sioux Tribe, 897 F.2d 358 (8th Cir. 1990) (holding that South
Dakota could not apply its law establishing wager limits and other gaming
constraints on blackjack gaming on tribal lands).

Although the Supreme Court and this Court have characterized the preemption analysis for Indian taxation cases as unique, the reasoning for this unique analysis is that "this jurisprudence relies 'heavily on the doctrine of tribal sovereignty . . . which historically gave state law 'no role to play' within a tribe's territorial boundaries.'" Wagnon, 546 U.S. 95, 112 (2005) (quoting Okla. Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 123–24 (1993)); see also Bracker, 448 U.S. at 143 ("The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law.").

But the relation to tribal sovereignty is not unique to the Indian taxation context. Indeed, Indian gaming similarly implicates concern for tribal sovereignty. See, e.g., 28 U.S.C. § 2702(1) (characterizing Indian gaming as a "means of promoting tribal economic development, self-sufficiency, and strong tribal governments"); Bay Mills, 134 S. Ct. at 2043 (Sotomayor, J., concurring) (explaining that Indian gaming operations are not "wholly separate from [t]ribes' core governmental functions"). In light of the shared relation to tribal sovereignty, we find Indian taxation cases to be instructive in the Indian gaming context.

In Wagnon, the Supreme Court refused to perform the Bracker preemption analysis based on "downstream economic consequences" of a state tax that applied to non-Indians based on transactions involving the receipt of motor fuel

-15-

outside of Indian lands. 546 U.S. at 114. Further, this court in Muscogee (Creek) Nation rejected a tribe's argument that state seizure of unstamped cigarettes outside Indian country was preempted because it indirectly and impermissibly affected the tribe. 669 F.3d at 1180–81. In so holding, we explained that "collateral consequence[s]" or "ancillary effects arising from enforcement of nondiscriminatory state laws outside Indian country do not call for a Bracker preemption analysis." Id. at 1181; see also Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134 (1980) (holding that neither preemption nor tribal sovereignty prevented a state from taxing cigarette sales made on the reservation to non-members of the tribe even though the tax deprived the tribe of substantial revenues used for essential government services).

We conclude that this same reasoning extends to the IGRA context, thereby demonstrating that the traditional preemption analysis applies. The dissent, however, argues that this reasoning requires consideration of the Supreme Court's decision in Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832 (1982). But our case is readily distinguishable. In Ramah Navajo, the Court held that New Mexico's assessment of gross receipts tax on a non-Indian construction company building a tribal school was preempted. Id. at 839–45. In so holding, the Court principally relied on the comprehensive and pervasive federal scheme regulating the construction and financing of Indian educational institutions — a scheme that left no room for additional burdens

-16-

imposed by the State. Id. at 839–42. Indeed, the Court expressed that the federal regulatory scheme in Ramah Navajo "left the State with no duties or responsibilities." Id. at 843 (citation omitted).

It is the existence of a comprehensive regulatory scheme, not merely the fact that the burden of the regulatory activity may fall on a tribe, that suggests preemption. See Bracker, 448 U.S. at 151 n.15. Here, however, no comprehensive regulatory scheme addresses the state regulatory action at issue. IGRA is silent as to the regulation of licensing for gaming vendors. Further, Congress expressly contemplated co-existence of state gambling laws. See 18 U.S.C. § 1166(c). This is not a situation where IGRA has left states with no duties or responsibilities over the subject matter. Thus, Ramah Navajo is inapposite.

Further, the dissent, like the Pueblo, emphasizes the burdensome effect of the State's regulatory action. Although the Pueblo alleges effects that are arguably more burdensome than those in the taxation cases, we find this to be a distinction without a difference on our facts. The State action only targets non-Indian gaming vendors' transactions with non-Indian gaming operators, not the Pueblo — a critical fact that neither the Pueblo nor the dissent persuasively addresses. Because nothing prevents the vendors' transactions with the Pueblo, this is quite unlike a state preventing a transaction by "strip[ping] a utility of its license for offering utilities to the Pueblo." Dissent Op. at 6. Accordingly, we

-17-

think any downstream consequences on the Pueblo stemming from the State's regulatory action at issue here are too attenuated to trigger <u>Bracker</u> balancing.

### 2. *Traditional Preemption Analysis*

The traditional preemption analysis looks to whether federal law expressly or implicitly preempts state law. Absent express preemptive language in the statute, Congress may implicitly preempt state law "where the scheme of federal regulation is so pervasive as to make reasonable inference that Congress left no room for the States to supplement it" ("field preemption"), or "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" ("conflict preemption"). <u>Gade v. Nat'l Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 98 (1992) (internal quotations marks and citations omitted).

IGRA does not expressly preempt state regulatory action that occurs off Indian lands. Rather, IGRA is intended to expressly preempt state regulation of gaming activity that occurs *on* Indian lands. <u>See</u> <u>United Keetoowah</u>, 927 F.2d at 1179. Indeed, "[e]verything — literally everything — in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." <u>Bay Mills</u>, 134 S. Ct. at 2034. In other words, the statute does not address gaming activities that occur off Indian lands, and thus it does not preempt state regulation of such activities. Furthermore, the state regulatory action at issue did

not occur on tribal lands, and the State's conduct does not directly prohibit gaming or prevent vendors from contracting with the Pueblo. We therefore conclude that IGRA does not expressly preempt the State's actions.

IGRA also does not implicitly preempt the State's off-reservation actions. Although it is not clear whether the Pueblo is arguing field preemption, it does not apply here. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Arizona v. United States, 567 U.S. 387, 401 (2012). Such congressional intent is not evident with IGRA, as the Act expressly pertains to on-reservation conduct, thereby allowing states to regulate tribal gaming outside Indian territory. Bay Mills, 134 S. Ct. at 2034. Further, IGRA includes provisions codified in the criminal code stating that "all State laws pertaining to the licensing, regulation, or prohibition of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." 18 U.S.C. § 1166(a). Because IGRA expressly contemplates parallel state laws, there is no manifestation of congressional intent to preempt the field.

Similarly, IGRA does not implicitly preempt the State's actions based on conflict preemption. As noted, conflict preemption exists where it is impossible to comply with both federal and state law, or where state law poses an obstacle to congressional objectives. But here it is not impossible to comply with both federal and state law, because there are no conflicting obligations for state

-19-

licensees. Moreover, the licensees can continue doing business with the Pueblo (as no license is required), and the absence of a compact demonstrates that the State is without authority to take enforcement action to prohibit or penalize such transactions. See 18 U.S.C. § 1166(d). The state action complained of also does not pose an obstacle to congressional objectives. The purpose of IGRA is to provide a statutory basis for both the operation and regulation of gaming by Indian tribes. See 25 U.S.C. § 2702. The Pueblo's vendors are not prohibited from transacting business with the Pueblo. And any argument that the indirect effect on the Pueblo's gaming operations and revenues poses an obstacle to the goals of IGRA is not persuasive. The text of IGRA clearly evinces congressional intent that Class III gaming would not occur in the absence of a compact, 25 U.S.C. § 2710(d)(1)(C), and no such compact presently exists. Accordingly, conflict preemption also does not apply.

For similar reasons, we reject the Pueblo's argument that the Gaming Board's determination as to the unlawful nature of the Pueblo's gaming activities is an improper assertion of jurisdiction preempted by IGRA. New Mexico has not applied state law to conclude the Pueblo's continued gaming activities are illegal. Despite the Pueblo's contrary characterization, it is clear that "Class III gaming activities shall be lawful on Indian lands only if such activities are . . . conducted in conformance with a Tribal-State compact." Id. Because the Pueblo's gaming activities are not conducted pursuant to a compact or an alternative mechanism

-20-

permitted under IGRA, the Pueblo's present gaming is unlawful under federal law, and the State's conclusion to this effect was not an exercise of jurisdiction that IGRA preempts.

AFFIRMED. The temporary injunction against the Defendants entered by this court pending appeal is dissolved.

*Pueblo of Pojoaque, et ano. v. State of New Mexico, et al.,* No. 16-2228
**BACHARACH**, J., dissenting.

The majority concludes that under the Indian Gaming Regulatory Act, a state's regulation of gaming on tribal land is preempted only when the regulation is direct—not indirect. But in my view, the Pueblo's well-pleaded allegations trigger preemption of New Mexico's regulation of the Pueblo's vendors. Accordingly, I respectfully dissent.

The threshold issue here is which test governs the preemption issue. The district court applied a traditional preemption test, concluding that New Mexico's regulation of the Pueblo's vendors is not preempted by IGRA. The Pueblo urges application of a stricter preemption test, which is outlined in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). Under this test, the court conducts "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Bracker*, 448 U.S. at 144. This particularized inquiry leads to preemption if state regulation "interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 325 (1983).[1]

---

[1] The majority states that the *Bracker* test arises in the context of state taxation. Maj. Op. at 12. That is true, but the Supreme Court and our court have also applied *Bracker* in various other settings. *See*, *e.g.*, *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983) (applying *Bracker* to preempt enforcement of New Mexico's hunting and fishing regulations on

To determine which test to apply, the majority asks "whether the State is regulating Indian gaming on tribal lands." Maj. Op. at 13. In my view, the majority's framing of the issue would require us to apply the stricter preemption test outlined in *Bracker*. Because the district court did not apply that test, I would reverse and remand.

The majority's contrary view is based on case law involving taxation of non-Indians in Indian country. In that setting, we have held that "ancillary effects arising from enforcement of nondiscriminatory state laws outside Indian country" do not call for a more rigorous preemption analysis. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1181 (10th Cir. 2012). That holding does not apply here because the effects of New Mexico's regulation on the Pueblo tribe were not "ancillary."

We have regarded the effects as "ancillary" only when they were truly minimal. For example, in *Muscogee (Creek) Nation v. Pruitt*, we regarded the possible effects of Oklahoma's cigarette taxation regime on the Muscogee Nation as ancillary with respect to

- the "'minimal burdens' on Indians to collect cigarette taxes from non-Indians for transactions occurring in Indian country" and

- the unavailability of certain brands of cigarettes in Indian country.

---

tribal land); *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1186, 1202-03 (10th Cir. 2011) (applying *Bracker* to consider possible preemption based on the Indian Mineral Development Act).

2

*Muscogee Nation*, 669 F.3d at 1176, 1181 (quoting *Moe v. Conf. Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 483 (1976)).

In determining whether to apply *Bracker*, neither the Supreme Court nor our court has ever drawn a rigid distinction based on the directness of the effect on a tribe. To the contrary, the Supreme Court's opinions on Indian taxation establish that *Bracker* may be triggered even when the burden on the tribe is indirect.

For example, the Supreme Court addressed this issue in *Ramah Navajo School Board, Inc. v. Bureau of Revenue*, 458 U.S. 832 (1982). In *Ramah Navajo*, the Ramah Navajo contracted with a non-Indian construction firm to build a school on Indian land. The contract required the Ramah Navajo to reimburse the firm for all costs of construction, including a gross receipts tax levied by New Mexico. The firm paid the tax and obtained reimbursement from the Ramah Navajo. 458 U.S. at 835. The Ramah Navajo sought a refund based on preemption of the tax by various federal statutes and regulations. *Id*. at 840.

The Supreme Court found preemption of New Mexico's assessment of the gross receipts tax on the Ramah Navajo's construction firm. Preemption was necessary, the Court explained, because *Bracker* was "indistinguishable in all relevant respects" even though the state had levied the tax outside Indian country, directly burdening only the non-Indian construction firm. *Id*. at 839, 843-44.

3

New Mexico had urged the Supreme Court to adopt a test under which the stricter preemption test would be used only when "the legal incidence and not the actual burden of the tax" falls in Indian country. *Id.* at 844 n.8. The Court rejected this argument:

> [I]n [*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980)], we found it significant that the economic burden of the asserted taxes would ultimately fall on the Tribe, even though the legal incidence of the tax was on the non-Indian logging company. Given the comprehensive federal regulatory scheme at issue here, we decline to allow the State to impose additional burdens on the significant federal interest in fostering Indian-run educational institutions, even if those burdens are imposed indirectly through a tax on a non-Indian contractor for work done on the reservation.

*Id.*

New Mexico's actions against the Pueblo involve regulation, not taxation. But, the majority's reliance on Indian taxation cases would also require us to apply the reasoning from *Ramah Navajo*. Our case involves a "comprehensive federal regulatory scheme," embodied in IGRA, like the regulatory scheme that triggered preemption in *Ramah Navajo*.

The majority attempts to distinguish *Ramah Navajo* on the ground that IGRA does not expressly regulate licensing for vendors and contemplates the coexistence of state and federal gaming regulation. Maj. Op. at 17. I respectfully disagree with these efforts to distinguish *Ramah Navajo*.

4

There, the statutes were also silent on the tax at issue (a tax on a non-Indian firm's construction of a school on Indian land). *See Ramah Navajo*, 458 U.S. at 843. Notwithstanding the statutes' silence on the state tax, the Supreme Court found preemption based on the general breadth of the regulatory scheme. *Id*. at 843-44.

The same is true here: Like the regulatory scheme in *Ramah Navajo*, IGRA does not directly address the particular matter at issue (a state's licensing of gaming vendors). But IGRA's preemptive sweep is broad, just like the regulatory scheme at issue in *Ramah Navajo*. *See Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 545 (8th Cir. 1996) (discussing IGRA's "extraordinary preemptive power").

The majority also points out that IGRA contemplated the coexistence of some state and federal regulatory laws. Maj. Op. at 17. This is true, but does not distinguish *Ramah Navajo*. Though state gaming laws are enforceable under IGRA, the absence of a compact leaves the federal government with exclusive jurisdiction to carry out that enforcement. *See* 18 U.S.C. § 1166(d); *see also Gaming Corp.*, 88 F.3d at 547 ("With only . . . limited exceptions . . . , Congress left the states without a significant role under IGRA unless one is negotiated through a compact.").

*Ramah Navajo* requires assessment of the effect of the state regulatory action on the Pueblo. *See Cabazon Band of Mission Indians v. Wilson*, 37 F.3d 430, 434 (9th Cir. 1994) (relying on *Ramah Navajo* to find

5

preemption of a state fee imposed on licensees because the actual burden had fallen on two Indian bands conducting gambling businesses on tribal reservations). That assessment begins with the standard of review. *See United States v. Fonseca*, 744 F.3d 674, 682 (10th Cir. 2014) ("'[T]he court, not the parties, must determine the standard of review, and therefore, it cannot be waived.'" (quoting *Worth v. Tyer*, 276 F.3d 249, 262 n.4 (7th Cir. 2001))). As the majority states, our review is de novo. But we must apply de novo review based on the standard in effect in district court. *See Lykins v. CertainTeed Corp.*, 555 F. App'x 791, 797 n.2 (10th Cir. 2014) (unpublished) (stating that we obviously must apply the standard of review governing in district court even though the standard had gone unaddressed in the parties' appeal briefs).

The district court was considering a motion to dismiss under Rule 12(b)(6). "[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

Under this standard, we must credit the Pueblo's allegations in the complaint. These allegations state that New Mexico was targeting vendors in order to punish the Pueblo, resulting in major disruption to the Pueblo's gaming operations. Complaint ¶¶ 73, 76, 78, 80. This targeting of vendors

6

for a punitive purpose would constitute regulation of the Pueblo's gaming activity on tribal land.

Suppose that the state strips a utility of its license for offering utilities to the Pueblo, forcing it to close gaming operations on tribal property. What is the difference between that sort of regulation and an order to stop gaming operations (which the majority acknowledges is impermissible)? Maj. Op. at 13.

As alleged in the complaint, New Mexico is regulating Indian gaming on tribal land. This form of regulation triggers the more stringent preemption test in *Bracker*, which applies to state regulation of tribal gaming activity on Indian land. As a result, I would remand for the district court to reconsider preemption of New Mexico's regulatory actions under the test outlined in *Bracker*.

\* \* \*

This appeal turns on what constitutes regulation of tribal gaming. The majority answers narrowly, stating that New Mexico is regulating Indian gaming only when the regulation is directly applied to Indian gaming on tribal land. In my view, this approach is unsupportable and unrealistic. Under the allegations in the Pueblo's complaint, New Mexico is trying—with considerable success—to disrupt the Pueblo's gaming operations by targeting the Pueblo's vendors. This disruption is not softened by the state's strategy of targeting vendors.

7

In reviewing the dismissal for failure to state a valid claim, I would conclude that IGRA preempts New Mexico's regulations regardless of whether the regulations affect the Pueblo directly or indirectly. The blow to the Pueblo is the same either way. Thus, I respectfully dissent.